Thuemmler vs. Barth.

Thuemmler, Intervener, Respondent, vs. Barth, Receiver, Appellant.

*January 9 — February 5, 1895.*

*Equity: Insolvent bank: Trust fund: Proceeds of draft collected: Priority of payment.*

1. A Milwaukee bank sent a draft which it had received for collection to a Chicago bank for collection *and credit.* Its account with the Chicago bank was then overdrawn, but the latter held collaterals to secure it against such overdrafts. The Chicago bank collected the draft and credited the proceeds on said account. In the meantime the Milwaukee bank failed. *Held,* that the owner of the draft was not entitled to a preference of payment out of the assets of the Milwaukee bank in the hands of the receiver, the proceeds of the draft not being traceable into any of such assets.

2. The receiver not having redeemed the collaterals in the Chicago bank and being under no obligation to do so, if the proceeds of the draft can be said to have been traced into such collaterals the remedy is against them and not against the general assets.

Appeal from an order of the superior court of Milwaukee county: J. C. Ludwig, Judge. *Reversed.*

An action was commenced July 24, 1893, against the South Side Savings Bank, for the purpose of winding up its affairs on account of its insolvency, and the above-named appellant was appointed receiver, and qualified as such. September 2, 1893, the respondent filed an intervening petition in said action, claiming, in substance, that on the 19th of July, 1893, she received a draft for $1,000 upon the treasurer of Security Lodge No. 672 of the Knights of Honor, which at that time she left with the officers of the South Side Savings Bank for collection, together with her policy or benefit certificate, and which they agreed to collect for her, they informing her that on the following Saturday they would have the money for her; that when she returned, July 22, 1893, the bank was closed and had suspended busi-

ness, and she could not obtain the money; that when said draft was so left for collection with the bank, the bank was insolvent, to the knowledge of the said officers, the cashier and teller; that the draft had been forwarded by said bank to the American Exchange National Bank, in the city of Chicago, with which the said South Side Savings Bank was transacting business on the 20th of July, 1893, and by said bank placed to the credit of the South Side Savings Bank; that subsequently the latter drew against the credit it had with the Chicago bank, and made its deposits and transacted business with it for upwards of two days afterwards, and the said draft so left for collection was transferred to said Chicago bank, and collected by the South Side Savings Bank, with full knowledge of the nature and character of the draft, and that the same went into the assets and property of the South Side Savings Bank, and was then among the assets of the estate and property of that bank in the hands of its said receiver, and the petitioner claimed the same out of the moneys in his hands.

The receiver answered the petition, and the issue was referred to a referee to hear, try, and determine the same, who reported findings of fact and conclusions of law, which, as modified by the court, are to the following effect:

Said draft was delivered by petitioner to the said South Side Savings Bank, indorsed by her in blank for collection, July 19, 1893. Gustav C. Trumpff was president, and John B. Koetting cashier, of said bank, each owning one half of the stock thereof, and the latter having the sole business management thereof. The draft was delivered to said Koetting personally, who told her that it would take two or three days to collect the same. It was taken by said Koetting, as cashier and manager of the bank, for collection only. When the petitioner called at the bank to receive the proceeds of collection she found that the bank closed its doors on the night of July 21, 1893, and that it had not

since opened them. Koetting, as cashier, did not send the draft to St. Louis, where the same was payable, for collection, but sent it, July 19, 1893, to the American Exchange National Bank of Chicago, the correspondent of said South Side Savings Bank, indorsed, "Pay A. L. De War, cashier, or order, for account of South Side Savings Bank, Milwaukee, Wisconsin." It was inclosed in a printed form filled up and signed by or under the order of Koetting, wherein it was stated that said draft was sent to said American Exchange National Bank of Chicago "for collection and credit." The latter bank forwarded it to St. Louis for collection, where it was paid July 21, 1893, of which it had notice on the morning of July 22, 1893. At the time of the receipt of said draft by said American Exchange National Bank, said South Side Savings Bank was indebted to it, by way of overdraft, in a sum upwards of $1,000, which indebtedness continued up to and including the 22d of July, 1893; and when it received notice of the payment of said draft it credited the proceeds thereof, $1,000, upon its books, to the account of said South Side Savings Bank, and sent notice of such credit to it by mail. On June 2, 1893, said American Exchange National Bank, having then in its possession a large amount of collaterals deposited with it by the South Side Savings Bank, had authorized the latter bank to overdraw its account to the extent of $25,000, but later, and before the failure thereof, the limit of such overdraft was reduced to $10,000. On July 22, 1893, the American Exchange National Bank paid a check of $10,000 drawn against it by said South Side Savings Bank, making the overdraft of the latter bank about $12,000. The proceeds of said draft were never remitted either to said South Side Savings Bank or to said receiver, but were retained by the American Exchange National Bank, and applied upon said overdraft of the South Side Savings Bank, and are claimed by it by virtue of such application.

Thuemmler vs. Barth.

When said draft was delivered for collection, as aforesaid, to said Koetting as cashier, said South Side Savings Bank was hopelessly insolvent, which Koetting then well knew. When the proceeds of said draft were credited to the South Side Savings Bank upon its indebtedness to the American Exchange National Bank of Chicago, the latter bank held, and now holds, the collaterals before mentioned, on their face amounting to about $50,000, which were deposited with it by the South Side Savings Bank as security for its overdrafts, and said securities are collateral to the overdraft of the South Side Savings Bank upon which the American Exchange National Bank applied the proceeds of said draft of $1,000, whereby such overdraft was reduced in a corresponding sum. Said collaterals are assets of the South Side Savings Bank belonging to the receiver, subject to the lien of the remaining overdraft so reduced as aforesaid. The said *Barth* was appointed receiver, and qualified as such, and took possession of all the assets of the bank which he could discover, and the petitioner, *Anna Thuemmler*, has never received from any source the proceeds of the draft, or any part thereof.

The conclusions of law are that the South Side Savings Bank never acquired any title to the draft in question, but received and accepted it as agent of the petitioner, for the purpose of collecting it and turning the proceeds over to her, and that she has an equitable trust in her favor against the estate of said South Side Savings Bank in the hands of said receiver, to the full amount thereof.

An order was made requiring the receiver to pay over to her the proceeds of her said draft, to wit, the sum of $1,000, with interest from July 22, 1893, from which order the receiver appealed.

For the appellant there was a brief by *Winkler, Flanders, Smith, Bottum & Vilas,* and oral argument by *J. G. Flanders.* 1. The facts do not show that the petitioner has any

claim against the South Side Savings Bank. Where a bank makes collections for its customers through other banks as sub-agents, the relation of the first bank to the customer is merely that of principal and agent until it has actually received the proceeds, or at least until, having received notice of payment to its correspondent, it has credited the amount to the account of the customer and thus elected to accept the credit of its correspondent in lieu of the actual receipt of the money. *First Nat. Bank v. Bank of Monroe*, 33 Fed. Rep. 408, 411; Morse, Banks & B. (2d ed.), 384; *Levi v. Nat. Bank*, 5 Dill. 107–111; *Fifth Nat. Bank v. Armstrong*, 40 Fed. Rep. 48. Before this stage in the transaction was reached the South Side Savings Bank suspended. It could not thereafter, by any act of the Chicago bank, be made to stand in the relation of debtor to the petitioner, a relation which it had not before sustained. *In re Armstrong*, 33 Fed. Rep. 405, 407; *Fifth Nat. Bank v. Armstrong*, 40 Fed. Rep. 48; *First Nat. Bank v. Bank of Monroe*, 33 id. 408, 411; *Manufacturers' Nat. Bank v. Continental Bank*, 148 Mass. 553. Even the relation of agency which had hitherto existed between the petitioner and the South Side Savings Bank, was, by the suspension of the latter, revoked and terminated. *In re Armstrong*, 33 Fed. Rep. 405, 408; *First Nat. Bank v. Bank of Monroe*, id. 408, 412. The Chicago bank holding the proceeds of the draft became directly liable for the same to the owner. If the receiving bank have notice of the qualified title of the transmitting bank, or if it have incurred no liability or made no advances on account of the paper received for collection, it cannot apply the proceeds upon an indebtedness of the transmitting bank as against the true owner. *Bank of Metropolis v. N. E. Bank*, 6 How. 212; *Hackett v. Reynolds*, 114 Pa. St. 328; *Van Amee v. Bank of Troy*, 8 Barb. 312; *Balbach v. Frelinghuysen*, 15 Fed. Rep. 675; *McBride v. Farmers' Bank*, 26 N. Y. 450; *Lawrence v. Stonington Bank*, 6 Conn.

521. The proceeds of the draft appear to be the property of the petitioner in the hands of the Chicago bank, rather than in the possession of the receiver. It is to that quarter that the petitioner should look for recovery. *Fifth Nat. Bank v. Armstrong,* 40 Fed. Rep. 49; *First Nat. Bank v. Bank of Monroe,* 33 id. 408; *West v. Am. Exch. Bank,* 44 Barb. 175; *Lindauer v. Fourth Nat. Bank,* 55 id. 75; *In re Armstrong,* 33 Fed. Rep. 407; *Dod v. Fourth Nat. Bank,* 59 Barb. 265; *McBride v. Farmers' Bank,* 26 N. Y. 450; Morse, Banks & B. 420, 421. 2. Conceding that the South Side Savings Bank is indebted to the petitioner for the amount of the draft, such indebtedness cannot be regarded as a preferred claim. *Nonotuck Silk Co. v. Flanders,* 87 Wis. 237; *In re Plankinton Bank,* id. 378.

For the respondent the cause was submitted on the brief of *Julius E. Roehr.* The South Side Savings Bank at once appropriated the draft and its proceeds and assumed the obligation of debtor to the petitioner. The difference between the case at bar and the cases cited by appellant is that this draft was remitted to the Chicago bank not for collection only, but by express direction for collection *and credit.* Under such circumstances the collecting bank has the right to retain the proceeds and apply the same upon a general account. *Hyde v. First Nat. Bank,* 7 Biss. 156; *Montgomery Co. Bank v. Albany C. Bank,* 7 N. Y. 459; *Nat. B. & D. Bank v. Hubbell,* 117 id. 393; *Briggs v. Cent. Nat. Bank,* 89 id. 184; *St. Nicholas Bank v. State Nat. Bank,* 128 id. 26; *Simpson v. Waldby,* 63 Mich. 439; *Wood v. Boylston Nat. Bank,* 129 Mass. 358, 37 Am. Rep. 366. In this case the trust fund is traced into assets of the South Side Savings Bank, in the shape of the collaterals held by the Chicago bank. These collaterals belong to, and are in law in the hands of, the receiver. It is apparent that by the application of the moneys of the petitioner upon the overdraft the general estate of the South Side Savings Bank

has been benefited to the full extent of the amount applied. Under these facts the petitioner has an equitable lien upon the general estate in the hands of the receiver. *Nurse v. Satterlee*, 81 Iowa, 491, and cases cited.

PINNEY, J. The South Side Savings Bank having received the draft in question from the petitioner for collection, it acquired no title to it or its proceeds; and if, in violation of its trust, it so dealt with the draft that it came to the possession of the American Exchange National Bank, and it received the proceeds of it, and converted them by applying them in part payment of its account against the first-named bank, while this would give the petitioner a right of action for the conversion, it would not, of itself, afford any ground for the relief she seeks, namely, to obtain a better position, as a claimant against the assets of the insolvent South Side Savings Bank in the hands of its receiver, than its general creditors, by the allowance of her demand as a trust claim, with a preference of payment over them in the administration of the assets of the bank. And the result would be the same even if the South Side Savings Bank had received the proceeds and used the same in payment of its debts so that they did not come to the hands of the receiver. The mere breach of trust growing out of the conversion of the proceeds of the draft would not entitle her to more than a money judgment against the bank at law.

The rule in relation to following trust funds wrongfully converted is that: "Whenever the property of a party has been wrongfully misapplied, or a trust fund has been wrongfully converted into another species of property, if its identity can be traced, it will be held, in its new form, liable to the rights of the original owner or *cestui que trust.* . . . That if any property in its original state and form is covered by a trust in favor of the principal, no change of that state can divest it of such trust or give the agent or trustee con-

Thuemmler vs. Barth.

verting it, or those who represent him in right (not being *bona fide* purchasers), any more valid claim in respect to it than they had before such change. . . . The right ceases only when the means of ascertainment fail; which, of course, is the case where the subject matter is turned into money, mixed and confounded in the general mass of property of the same description." 2 Story, Eq. Jur. §§ 1258, 1259. "If a trustee or other fiduciary person wrongfully disposes of his principal's securities, . . . equity impresses a constructive trust upon the new form or species of property . . . as long as it can be followed and identified. . . . No change in the form of the trust property, effected by the trustee, will impede the rights of the beneficial owner to reach it and to compel its transfer, provided it can be identified as a distinct fund, and is not so mingled up with other moneys that it can no longer be specifically separated." 2 Pom. Eq. Jur. §§ 1051, 1058. Whether the disposition of the fund be rightful or wrongful, the beneficial owner is entitled to the proceeds, whatever be their form, provided only he can identify them. *National Bank v. Insurance Co.* 104 U. S. 54.

In *Nonotuck Silk Co. v. Flanders*, 87 Wis. 237, it was held that one for whom a banker had collected a draft before making a voluntary assignment, was not entitled to a preference over other creditors if the proceeds of such collection were disposed of by the banker prior to the assignment so that no part thereof came in any form to the hands of the assignee, and, in substance, that the right of tracing trust funds has its basis in the right of property, and never was based upon the theory of preference by reason of an unlawful conversion, and that the complainant had in that case no legal right to a preference over the assignor's other creditors, in the distribution of his estate in the hands of the assignee, and into which no part of the complainant's money could be traced. To the same effect is *In re Plankinton*

*Bank*, 87 Wis. 385.   The doctrine of these cases is decisive against the claim of the petitioner, and this view of the law is sustained by a great weight of authority.   *In re Hallett & Co., Ex parte Blane*, [1894] 2 Q. B. Div. 237; *Little v.' Chadwick*, 151 Mass. 109; *In re Cavin v. Gleason*, 105 N. Y. 256; *Freiberg v. Stoddard*, 161 Pa. St. 259; *Philadelphia Nat. Bank v. Dowd*, 38 Fed. Rep. 172; *National Bank v. Insurance Co.* 104 U. S. 54; *Cecil Nat. Bank v. Thurber*, 8 C. C. A. 365.

The petitioner's case wholly fails, for the reason that it is conceded that the South Side Savings Bank did not receive the money collected on the draft, but the American Exchange National Bank did, and applied the same in reduction of the overdrawn account with it of the former bank; and whether rightfully or wrongfully it is not now material to determine.   There is no claim that the proceeds of the draft, or any property into which it may have been converted, have ever come to the hands of the receiver, or that any property or estate he has received has been improved or enriched thereby; and yet the judgment of the superior court makes the petitioner's claim a trust debt or preferred claim against all the property and assets the receiver has received, without reference to the question whether it has profited in the least by the proceeds of the draft.

It is, however, insisted that as the account of the South Side Savings Bank with the American Exchange National Bank was overdrawn in the sum of about $12,000, and the latter appropriated the proceeds of the draft in its reduction, and as it had received, and then held, securities of the South Side Savings Bank to the face amount of $50,000 as collateral to secure it against overdrafts by the South Side Savings Bank, therefore, by such application of the proceeds in reduction of the overdraft, the value of the interest of the South Side Savings Bank in the collaterals has correspondingly increased, and that this operated as a benefit

to its general estate in the hands of the receiver, for the reason that otherwise he would have had to take from the general fund $1,000 to effect such partial redemption; and it was also claimed that the proceeds of the draft had thus been traced into these collaterals, to the benefit and advantage of the general estate. The answer to this contention is obvious. The receiver is under no obligation to redeem the collaterals. He has not, so far as appears, obtained or claimed them, and it may not be for the interest of the estate in his hands that he should do so. In this posture of affairs, it cannot be presumed that the general estate has been benefited by such application of the proceeds of the draft; but, if the contention is sound that they have been traced into the collaterals, the remedy of the petitioner, manifestly, is to proceed against them, and not against the general assets in the hands of the receiver. For these reasons the order appealed from is erroneous.

*By the Court.*— The order appealed from is reversed, and the cause remanded for further proceedings according to law.